IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–01146–EWN

JOHN E. MARTIN,

     Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

     Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

     This is a social security benefits appeal under 42 U.S.C. § 405(g) (2006).  Plaintiff John E.

Martin ("Plaintiff") challenges the final decision of the Commissioner of Social Security (the

"Commissioner"), denying his application for Social Security Disability Insurance benefits.

Jurisdiction is based on 42 U.S.C. § 405(g).

## FACTS

**1.**    *Medical Evidence*

     Plaintiff was born on April 25, 1953.  (Admin. R. at 62 [filed May 23, 2004] [hereinafter

"Admin. R."].)  He was forty-eight years old at the onset of his alleged disability.  (*Id.* at 70.)

Plaintiff has an eleventh grade education and has worked in the vocationally relevant past as a

truck driver, small engine repairer, bus driver, forklift operator, and materials handler.  (*Id.* at 83.)

Plaintiff alleges an inability to work beginning April 22, 2002, due to: gran mal seizure disorder, Graves' Disease, headaches, fatigue, abdominal pain, atrial fibrillation, chest problems, neurological complaints, osteoarthritis, vertigo, and a smoke allergy.  (*Id.* at 70.)  Plaintiff's medical history is long and complex, and is best understood by following the progression of each of his relevant ailments separately.

### a.     *Gran Mal Seizure Disorder*

On April 21, 2002, Plaintiff had a witnessed seizure, lasting four to five minutes, that left him unresponsive to verbal stimuli.  (*Id.* at 220.)  He was brought to Penrose-St. Francis Hospital, where Dr. M. Ben Kates diagnosed Plaintiff with new onset seizure disorder.  (*Id.* at 220–21.)

Plaintiff received his primary care from Dr. Peter Clothier from November 2000 through February 2003.  (*Id.* at 25.)  In a clinical note dated May 11, 2002, Dr. Clothier reported that Plaintiff's seizure disorder was "medicated" and "quiescent."  (*Id.* at 258.)  Two days later, Dr. Clothier filled out and signed a Family Medical Leave Act Certificate for Plaintiff, stating that Plaintiff was "recently diagnosed [with] gran mal seizure disorder" that was "probably present" for the past ten years.  (*Id.* at 254.)  Dr. Clothier wrote the disorder was "lifelong" in duration but "should be stabilized soon."  (*Id.*)  The doctor further opined that, once stabilized, Plaintiff "could probably perform most physical activity," except commercial driving.  (*Id.* at 255.)

On May 14, 2002, Plaintiff saw Dr. William Herrera, a neurologist, regarding the seizures.  (*Id.* at 243.)  Plaintiff reported having three to four nocturnal seizures in the past seven months.  (*Id.*)  Dr. Herrera wrote in his May 14, 2002 clinical notes, "This is a patient with a history of

nocturnal epilepsy," which was likely caused by Plaintiff's childhood head injury.[1]  (*Id.* at 244.)
Dr. Herrera placed Plaintiff on a new anti-seizure medication, Carbatrol, and noted that due to the
seizures, Plaintiff's commercial license should be revoked.  (*Id.*)  Because Plaintiff's seizures were
only nocturnal, the doctor stated Plaintiff could continue operating his personal vehicle.  (*Id.*)

On May 30, 2002, Dr. Herrera reported that Plaintiff  "seems to be seizure free for the
time being on Carbatrol."  (*Id.* at 242.)  Dr. Herrera advised Plaintiff to seek a new job that would
not involve commercial driving, but allowed that "given his predominantly nocturnal epilepsy . . .
[Plaintiff] probably could operate machinery for the most part."  (*Id.*)

On June 3, 2002, Dr. Clothier again saw Plaintiff, and noted that his seizure disorder was
"medicated" and "stable."  (*Id.* at 251.)  During a February 5, 2003 visit with Dr. Clothier,
Plaintiff complained of "[t]wo 'spells'" in the "past several weeks[,] commensurate with recently-
diagnosed seizure disorder."  (*Id.* at 297.)  Dr. Clothier noted that Plaintiff takes his medications
"faithfully."  (*Id.*)

In early 2003, Dr. Lawrence J. Adams began treating Plaintiff's seizure disorder.  (*Id.* at
370).  In a letter to Dr. Clothier dated February 11, 2003, Dr. Adams wrote that he would
increase Plaintiff's dose of Carbatrol, due to the fact of his continuing "spells."  (*Id.*)  On April 28,
2003, Dr. Adams noted that "by his history, [Plaintiff] has not had any seizures in several
months."  (*Id.*)  Also, on April 28, 2003, Dr. Adams wrote a letter to Plaintiff regarding activity
limitations due to his seizure disorder.  (*Id.* at 369.)  The doctor stated:

---

[1]On April 28, 2003, Dr. Adams interpreted a magnetic resonance imaging ("MRI") of
Plaintiff's brain to show evidence of "significant head trauma at the age of ten."  (*Id.* at 366.)

> As per our conversation in the office on [April 28, 2003], with seizures, you need to consider yourself prone to lose consciousness at any time and without warning. The chance of having further daytime seizures after you have not had any seizures after six months is declined, but before that, you should not drive an automobile, work at heights, work with heavy equipment, or do anything else where sudden loss of consciousness will get you in trouble.

(*Id.*)  That same day, in a letter to Dr. Randall Nations, Dr. Adams explained that he was attempting to control Plaintiff's seizures with medication, but that Plaintiff is "without complete control," and it is unknown whether Plaintiff will ever be "under complete control."  (*Id.* at 367.)

On August 14, 2003, Dr. Karen M. Wyatt, a family practitioner at Summit Community Care Clinic reported that Plaintiff had vertigo for thirteen minutes, which may have been associated with a seizure.  (*Id.* at 390.)

Plaintiff kept a medical journal spanning April 21, 2002 to April 22, 2002; May14, 2002 to May 25, 2002; and September 14, 2002 to March 28, 2004.  (*Id.* at 307, 306, 159–75.)  These journals document nighttime seizures at least every other day, as well as daytime seizures on a more intermittent basis.  (*Id.*)

### b.    *Graves' Disease*[2]

Plaintiff began treatment for Graves' disease in August of 1986.  (*Id.* at 212.)  His primary complaints regarding the disease have been optical in nature.  Beginning in 1999, Plaintiff's

---

[2]Graves' disease (hyperthyroidism) is "[t]he condition resulting from an abnormal and/or excessive activity of the thyroid gland. . . .  The outstanding symptoms are nervousness, rapid beating of the heart, protrusion of the eyeballs (exophthalmos), excessive perspiration, trembling of the fingers, increased rate of metabolism, etc.."  3–H ATTORNEYS' DICTIONARY OF MEDICINE 3340 (Matthew Bender & Co. 2005).

Grave's disease was followed by Dr. L. Gold, an endocrinologist.  (*Id.* at 216.)  On March 3, 2000, Dr. Gold diagnosed Plaintiff with severe Graves' ophthalmopathy, also called thyroid eye disease.  (*Id.* at 215.)  Dr. Gold noted Plaintiff had intermittent discomfort in the eyes, photophobia (light sensitivity), and diplopia (double vision) with downward gaze.  (*Id.*)

From April 25, 2000 through July 2, 2002, Plaintiff was seen by Dr. C.E. Fogleman regarding his Graves' ophthalmopathy.  (*Id.* at 282–88.)  Dr. Fogleman wrote that in April of 2000, Plaintiff was "already noting diplopia in downgaze but also redness and photosensitivity. He was having tearing in the wind and symptoms of exposure."  (*Id.* at 282.)  On August 3, 2000, Dr. Fogleman performed thyroid eye disease-related eye surgery on Plaintiff.  (*Id.* at 282–88.) Postoperatively, Dr. Fogleman determined that Plaintiff "has done well and has much better control of his symptoms," with "much less tearing and less corneal exposure."  (*Id.* at 285.) Plaintiff, however, stated Dr. Fogleman, continued to experience "double vision and tilting of objects especially in downgaze."  (*Id.* at 282.)

In October 2000, Plaintiff was referred to Dr. Julie S. Yu, a specialist in ocular motility. (*Id.* at 207–10.)  Dr. Yu indicated that Plaintiff had Graves' ophthalmopathy with a very small deviation and "best corrected visual acuity at 20/20 in each eye."  (*Id.* at 207.)  Dr. Yu prescribed bifocals for Plaintiff and noted that Plaintiff experienced some double vision, which may be helped with prisms.  (*Id.*)

On March 14, 2001, Dr. Gold wrote that Plaintiff's optical "[s]ymptoms are unchanged." (*Id.* at 213.)  In September 2001, Dr. Gold noted that Plaintiff was experiencing only "rare discomfort in the eyes," but that otherwise there was "no change in symptoms." (*Id.* at 212.)

In July of 2002, Dr. Fogleman referred Plaintiff to Dr. Nieca D. Caltrider for possible eye surgery to treat Plaintiff's ongoing "double vision and tilting of objects especially in downgaze." (Id. at 309.)  Dr. Fogleman noted that Plaintiff had been fitted for prisms by Dr. Yu, and that since then, Plaintiff "is functioning reasonably well."  (*Id.*)  Dr. Caltrider subsequently diagnosed Plaintiff with right esotropia[3] and right hypertropia[4].  (*Id.* at 315.)  On February 12, 2003, Dr. Caltrider performed surgery on claimant's right eye.  (*Id.*)  In a letter to Dr. Fogelman, Dr. Caldrider noted that postoperatively, Plaintiff "stated he had significant improvements in double vision.  He may still have occasional intermittent double vision at distance but is able to do most of his activities of daily living."  (*Id.*)  On March 26, 2003, stating that she was "happy with [Plaintiff's] surgical outcome," Dr. Caltrider released Plaintiff from her care.  (*Id.* at 316.)

### c.    *Headaches*

The medical record reveals numerous notations that Plaintiff experienced chronic headaches beginning in 2000.  In November of 2000, an unsigned clinical note copied to Dr. Clothier reported Plaintiff was experiencing "chronic headaches."  (*Id.* at 211.)  In May of 2002, Dr. Clothier noted that Plaintiff was experiencing "mild, dull, generalized headaches since

---

[3]Esotropia is "[a] condition in which an eye is turned inward, towards the nose, as compared with the normal position it should assume when both eyes are directed towards an object."  2-E ATTORNEYS' DICTIONARY OF MEDICINE 5546 (Matthew Bender & Co. 2005).

[4]Hypertropia is "[t]he condition in which one eye is turned upward with reference to the other eye (the eye with the better vision) while the person is looking at an object."  3-H ATTORNEYS' DICTIONARY OF MEDICINE 5546 (Matthew Bender & Co. 2005).

beginning [his anti-seizure medication]" in April 2002.  (*Id.* at 258.)  In an April 28, 2003 letter to

Dr. Clothier, Dr. Adams reported that Plaintiff "continues with chronic daytime headaches with

photophobia but without nausea."  (*Id.* at 366.)  He opined that these headaches are "migraine-

variant," triggered by "a combination of stress, but mainly his sleeping problems."  (*Id.*)  That

same day, in a letter to Dr. Nations, Dr. Adams reported that Plaintiff's "chronic daily headaches"

were "beginning to get under control."  (*Id.* at 367.)  From September 2002 through March 2004,

Plaintiff documented headaches several times a week in his medical journal.  (*Id.* at 159–75.)

### d.    Fatigue

With the onslaught of Plaintiff's seizure disorder in April 2002, his medical records reflect

numerous complaints of daytime fatigue.  Dr. Clothier noted on April 28, 2002  that Plaintiff was

"[t]ired today," and on May 11, 2002, that Plaintiff was "[a] little fatigued."  (*Id.* at 262, 258.)

Three days later, Plaintiff reported that he experienced "fatigue which respond[s] to a nap."  (*Id.*

at 253.)  Otherwise," noted Dr. Clothier, Plaintiff "sleeps restfully."  (*Id.*)

In June of 2002, Dr. Clothier wrote that Plaintiff's sleep is "not always restful due to right

hip and shoulder pain."  (*Id.* at 251.)  In an April 28, 2003 letter to Dr. Clothier, Dr. Adams

referenced Plaintiff's "sleeping problems," as well as his  "excessive daytime somnolence."  (*Id.* at

366.)  On September 9, 2003, Dr. Gold noted that Plaintiff "has been tired," and a few days later

Plaintiff presented with "complaints of sleep disturbances."  (*Id.* at 300, 384.)

In his disability application, Plaintiff described his sleeping habits as "restless," explaining

that he wakes up multiple times in the night, and often gets only three to five hours of sleep.  (*Id.*

at 117.)  Plaintiff further noted that Duradin, the medicine he takes for headaches, causes

drowsiness.  (*Id.* at 110.)

      *e.*      ***Abdominal Pain***

      Plaintiff has a documented history of irritable bowel disease, peptic ulcers, and

diverticulitis.[5]  (*Id.* at 197, 192, 401.)  Unidentified doctors at Dreyer Medical Clinic reported: (1)

in 1984, Plaintiff experienced abdominal pain that subsided with medication, (*id.* at 191); (2) in

1985 Plaintiff had peptic ulcers and was seen for continuing complaints of abdominal pain that

resulted in urgent care, (*id.* at 192, 194–95); (3) in 1986 Plaintiff's "[gastrointestinal] symptoms

[were] slowly improving," (*id.* at 196); and (4) by 1991, Plaintiff's irritable bowel was reported as

"under good control," (*id.* at 202).

      In late October of 2000, Dr. John Bell at Dublin Primary Care diagnosed Plaintiff with

gastroenteritis and treated him for the same.  (*Id.* at 268.)  On April 21, 2002, Plaintiff was

admitted to the Penrose-St. Francis Hospital for complaints of nausea and vomiting.  (*Id.* at 220.)

Plaintiff's abdominal x-rays were negative, and on April 22, 2002, Dr. Kates reported that

Plaintiff's "abdominal pain has improved."  (*Id.*)  In October of 2003, Plaintiff complained to

doctors at Summit Community Care Clinic of nausea and vomiting due to what Plaintiff termed

"abd[ominal] seizures."  (*Id.* at 389.)

---

[5]Diverticulitis is "[i]nflamation of a . . . sac or pouch coming off a main cavity of an organ, as the intestine, stomach, etc.."  2-D ATTORNEYS' DICTIONARY OF MEDICINE 3909 (Matthew Bender & Co. 2005).

Finally, from January 11, 2004 through January 15, 2004, Plaintiff was hospitalized at St. Anthony Hospital for severe abdominal pain.  (*Id.* at 401.)  Plaintiff was diagnosed with diverticulitis and small polyps.  (*Id.* at 409.)  Plaintiff's polyps were removed, and his diverticulitis was treated with antibiotics.  Prior to release from the hospital, Dr. Phillip Mallory determined Plaintiff's diverticulitis was "resolving."  (*Id.* at 402.)

### f.   *Atrial Fibrillation/Chest Problems*

Beginning in 1986, Plaintiff's medical records document intermittent complaints of heart palpitations.  (*Id.* at 195, 196.)  In November of that year, a doctor from Dreyer Medical Clinic concluded that Plaintiff had an "intermittent atrial fibrillation" and placed Plaintiff on medication to treat the condition.  (*Id.* at 196.)

On March 3, 2000, March 14, 2001, and September 18, 2001, Dr. Gold wrote in clinical notes that Plaintiff experienced no palpitations, chest pain or shortness.  (*Id.* at 215, 213, 212.)  On May 14, 2002, however, Dr. Gold noted Plaintiff's "recent onset" of "substernal chest discomfort."  (*Id.* at 253.)  In June 2003, Plaintiff reported a "forceful heartbeat" to Dr. Gold.  (*Id.* at 297.)  Then, in September 2003, Dr. Gold wrote Plaintiff had experienced "some palpitations recently," but stated he had "no chest pain or shortness of breath."  (*Id.* at 384.)

On February 4, 2004, Dr. Gold again wrote that Plaintiff had "no palpitations, chest pain or shortness of breath."  (*Id.* at 383.)  One month later, in a letter to Dr. Gold, the Plaintiff refuted the doctor's findings of the previous month, asserting that Plaintiff did in fact experience palpitations "at times," shortness of breath "often," and chest pains.  (*Id.* 382.)  Plaintiff stated that he had experienced most of these symptoms since 1986.  (*Id.*)

In 1984 and again in 2003, Plaintiff was given an echocardiogram.[6]  Both exams showed

no evidence of ischemic[7] heart disease and were essentially normal, with the exception of only

mild ventricular insufficiency.  (*Id.* at 191, 291, 383, 399.)

**g.      *Neurological Complaints***

In June 2002, a Social Security Administration field officer noted in his disability report

that Plaintiff had difficulty understanding and answering questions.  (*Id.* at 81.)  Further, the

examiner stated, "I observed early on, that if I talked too fast [Plaintiff] was not understanding

me, so I slowed my speech down.  On occasion I would ask him a multiple question [sic], and he

would ask me to repeat, one question at a time."  (*Id.*)  Additionally, Dr. Wyatt determined in a

May 7, 2004 functional capacity assessment ("FCA") that Plaintiff's "mental acuity, memory,

concentration, balance and coordination are all impaired due to a brain injury (verified by

examination)."  (*Id.* at 420.)

Outside of these two references, Plaintiff's medical records document no neurological

deficiencies.  After Plaintiff's first seizure in April 2002, an emergency room doctor reported that

Plaintiff "has no neurologic deficits on a detailed neurologic examination.  Finger to nose is

normal.  Gait is normal.  No focal motor or sensory deficits."  (*Id.* at 298.)  Similarly, Dr. Clothier

characterized Plaintiff's June 6, 2003 neurological exam as "grossly normal with no focal or

laterlizing signs.  There is no motor weakness in the major muscle groups."  (*Id.* at 310.)  Finally,

---

[6]An echocardiogram is "[a]n outline of the heart prepared by the use of ultrasound."  2-E ATTORNEYS' DICTIONARY OF MEDICINE 239 (Matthew Bender & Co. 2005).

[7]Ischemic means pertaining to, or affected by diminution in the blood supply.  3-I ATTORNEYS' DICTIONARY OF MEDICINE 239 (Matthew Bender & Co. 2005).

in a June 28, 2003 letter to Dr. Clothier, Dr. Adams noted that Plaintiff's "neurologic examination in the past has been normal." (*Id.* at 366.)

In his 2002 disability application, Plaintiff asserted that although he can understand most things, he has difficulty remembering multi-part instructions. (*Id.* at 120, 114.)

### h.     Osteoarthritis

Plaintiff has osteoarthritis involving his right hip and shoulder. (*Id.* at 384.)  His medical records reveal some complaints of shoulder and hip pain that prevented Plaintiff from sleeping soundly. (*Id.* at 251, 300, 110–11.)  On September 9, 2003, Dr. Gold reported that Plaintiff's osteoarthritis was "[i]mproved by [medication]." (*Id.* at 384.)  In her May 7, 2004 FCS, however, Dr. Wyatt determined that Plaintiff's arthritis substantially limited his ability to lift, carry, sit, walk, stand, and "use his hands[,] especially for fine motor tasks." (*Id.* at 416–17.)

### i.     Vertigo

On August 14, 2003, Plaintiff reported to Dr. Wyatt that, during a "[s]eizure last week," he "had vertigo for [thirteen] minutes." (*Id.* at 390.)  From late 2002 through March 2004, Plaintiff documented dizzy spells fifteen or more times each month in his medical journal. (*Id.* at 159–74.)

### j.     Smoke Allergy

In the early 1990's, Plaintiff tested positive for a "severe allergy" to tobacco smoke.  Both Dr. Ronald Wolfson and Dr. Clothier wrote letters recommending that Plaintiff work in a smoke-free environment. (*Id.* at 290, 305.)

### k.  *Functional Capacity Assessments*

On August 22, 2002, a state agency physician performed an FCA regarding Plaintiff.  (*Id.* at 176–83.)  The physician concluded that Plaintiff could: (1) lift or carry fifty pounds occasionally; (2) lift or carry twenty-five pounds frequently; (3) stand and/or walk six hours in an eight-hour work day; (4) sit about six hours in an eight-hour workday; (5) push and pull in an unlimited way within the lifting and carrying restrictions; (6) climb occasionally; and (7) balance, stoop, kneel, crouch, and crawl frequently.  (*Id.* at 177–78.)  Further, the physician determined that Plaintiff had no visual, manipulative, communicative, or environmental limitations, except that Plaintiff needed to avoid exposure to hazards, such as machinery and heights.  (*Id.* at 179–80.)

On May 7, 2004, Dr. Wyatt also performed an FCA.  (*Id.* at 416–20.)  Dr. Wyatt concluded that Plaintiff could: (1) lift and carry up to ten pounds occasionally; (2)  reach, handle and finger occasionally; (3) sit for up to three hours in an eight-hour workday; and (4) stand and walk for up to one hour in an eight-hour workday.  (*Id.* at 416–19.)  Moreover, Dr. Wyatt determined Plaintiff could not: (1) read book print; (2) operate a motor vehicle; (3) remain sitting or standing for more than one hour at a time; or (4) be in any occupational situation in which a seizure could result in injury.  (*Id.* at 417–19.)  According to Dr. Wyatt, Plaintiff's "mental acuity, memory, concentration, balance, and coordination are all impaired due to brain injury (verified by examination)."  (*Id.* at 420).  Ultimately, Dr. Wyatt concluded Plaintiff could not engage in substantial gainful activity ("SGA").  (*Id.*)

On November 10, 2004, Dr. Wyatt opined that Plaintiff met or equaled the severity of the following listings: 11.01 (convulsive epilepsy), 11.03 (non-convulsive epilepsy), 11.18 (cerebral trauma), and 12.02 (organic mental disorder). (*Id.* at 429–31.)

### l. Plaintiff's Disability Application

Plaintiff's disability application included a questionnaire regarding his daily activities. Therein, Plaintiff stated the following: (1) he was capable of performing household chores, such as laundry, cooking, dishwashing, and shopping for food and personal needs; (2) he was able manage his finances and his medication; (3) he left the house three to five times a week to go to the post office, the store, or to his brother's workplace; (4) he drove sometimes but preferred to be driven by his brother; (5) he occasionally went out for a meal with his brother. (*Id.* at 112–13.) Plaintiff also stated he likes his family, friends and old co-workers, but rarely had the opportunity to socialize since he stopped work and moved in with his brother. (*Id.*)

## 2. Procedural History

On June 12, 2002, Plaintiff filed an application for disability insurance benefits. (*Id.* at 62–64.) On August 23, 2002, the Social Security Administration denied Plaintiff's application. (*Id.* at 46–50.) On September 16, 2002, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 42.) On April 15, 2004, the ALJ held a hearing at which Plaintiff and a vocational expert ("VE") testified. (*Id.* at 436-495.)

At the hearing, Plaintiff testified that because he was not working, he was forced to give up his private residence in Colorado Springs and move in with his brother in Summit County. (*Id.* at 471.) The ALJ then questioned Plaintiff regarding the medical problems that he believes render

him incapable of gainful employment.  (*Id.* at 451.)  Regarding his seizures, Plaintiff testified that

he experienced between eight and fifteen seizures each month, lasting between two to five minutes

each, some nocturnal and some daytime.  (*Id.* at 452, 455.)  According to Plaintiff, when a

daytime seizure occurred, he had an aura of fear, became confused, and felt faint.  (*Id.* at 453.)

Plaintiff stated that after a seizure, he felt "tired, stiff, and achy," often had a severe headache, and

needed to nap.  (*Id.* at 452–53, 475–76.)

Plaintiff asserted that Dr. Adams was mistaken when he wrote in an April 28, 2003 letter

to Dr. Clothier that "by his history [Plaintiff] has not had any seizures in several months."  (*Id.* at

478, 366.)  Plaintiff claimed he reported experiencing decreased headaches, not decreased

seizures to Dr. Adams.  (*Id.* at 478.)

Plaintiff testified that he experienced headaches on almost a daily basis and had "severe"

migraine-type headaches three to four times each week that sometimes required him to lay down

for two to four hours.  (*Id.* at 456–57.)  Plaintiff described the severe headaches as causing him

level-eight pain on a scale of one to ten.  (*Id.* at 457–58.)

Regarding his Graves' ophthalmopathy, Plaintiff testified that he still has double-vision in

his downgaze and has blurred vision if he does not properly adjust his glasses and gaze.  (*Id.* at

463.)  Plaintiff stated that while looking straight ahead with glasses, his vision was "fairly sharp."

(*Id.* at 464.)  Further, Plaintiff testified he was capable of reading the newspaper for brief periods

of time, watching television, preparing basic meals, and transcribing his medical journal onto a

computer.  (*Id.* at 465–66, 477.)

Plaintiff testified that fatigue is one of his greatest barriers to regular, sustained work.  (*Id.* at 451.)  He claimed his anti-seizure medication caused sleep difficulty, while both his headache medication and his seizures exacerbated his daytime fatigue.  (*Id.* at 452, 458–59.)

Plaintiff also testified to long-term memory problems requiring him to create "cheat sheets" to remember how to do simple, work-related tasks.  (*Id.* at 461.)  He denied any recent chest pains, but complained of continuing episodes of vertigo, lasting two to three minutes at a time.  (*Id.* at 461, 468–69.)  Although Plaintiff was  not able to estimate how often these episodes occurred, he claimed to have experienced two serious episodes in the past, at least one of which resulted in hospitalization.  (*Id.* at 468–69.)

Plaintiff testified to a "long history of osteoarthritis" that caused him pain primarily in his right hip and shoulder. (*Id.* at 470.)  When he took his medication daily, Plaintiff stated he was able to sleep at night for a few hours before waking up from pain.  (*Id.*)  Further, he claimed his osteoarthritis limited his ability to stand in one spot to fifteen minutes, and required him to sit for thirty minutes to an hour before standing again.  (*Id.* at 476.)  In an eight hour day, Plaintiff estimated he was capable of standing a total of sixty to ninety minutes.  (*Id.*)

Pat Pauline testified as a VE at the hearing.  (*Id.* at 482–93.)  The VE classified Plaintiff's past work as follows: (1) truck driver was semi-skilled and medium; (2) small engine/lawn mower repairer was skilled and medium; (3) bus driver was semi-skilled and medium; (4) forklift driver was semi-skilled and medium; (5) material handler was semi-skilled and heavy.  (*Id.* at 483.)  Additionally, the VE opined on a series of hypothetical questions posed by the ALJ, in which the VE was to assume an individual of Plaintiff's age, education and skill level, who could: (1)

-15-

occasionally lift up to fifty pounds; (2) frequently lift up to twenty-five pounds; (3) stand and walk at least six hours in an eight-hour workday; (4) sit at least six hours in an eight-hour workday; (5) occasionally climb stairs, balance, stoop, kneel, crouch, crawl, and reach over shoulder; (6) frequently climb ramps, handle, finger, and feel. (*Id.* at 483–84.) Further, the VE was to assume this hypothetical individual could not: (1) climb ladders, ropes, or scaffolding; (2) walk on rocky surfaces; or (3) work in a smoky environment. Moreover, this person should be assumed to have "bilateral vision problems," such that the individual should: (1) be limited to reading occasionally; (2) be required to read no smaller than standard newsprint; and (3) not be required to have acute distance vision beyond fifteen feet. (*Id.* at 483.) Finally, the ALJ stated, "[T]his person would be limited to understanding, [] remembering, and carrying out only simple work instructions and process, those kinds of things learned within a period of approximately [thirty] to [sixty] days." (*Id.*)

Based on these assumptions, the VE concluded that the hypothetical individual would not be capable of performing any of Plaintiff's past relevant work, but could work as a hospital cleaner (medium, unskilled) or a cleaner/housekeeper (light, unskilled). (*Id.*) Each of these jobs, stated the VE, exists in significant numbers in the regional and national economies and requires no more than occasional overhead reaching. (*Id.* at 486, 483.)

The ALJ posed a second hypothetical, in which he asked the VE to make all of the assumptions previously stated, except to limit lifting and carrying to twenty pounds occasionally, and ten pounds frequently. (*Id.*) The VE responded that such a person could work only in light jobs, such as a cleaner/housekeeper, sales attendant (light, unskilled), counter clerk (light,

unskilled).  (*Id.*)  Each of these jobs, stated the VE, exists in significant numbers in the regional and national economies.  (*Id.*)  When questioned regarding employee absences, the VE stated that an employee will be terminated if he misses more than two days in a "couple of months."  (*Id.* at 487–88.)  The VE further testified that an individual who experienced headaches three to four days a week for "several hours," which required the individual to lie down, would be precluded from engaging in SGA.  (*Id.* at 490.)  At the close of the hearing, Plaintiff's counsel requested a consultative examination regarding Plaintiff's osteoarthritis, arguing that such an examination was necessary to flush out the record.  (*Id.* at 493–94.)

On May 23, 2004, The ALJ issued a decision in which he determined Plaintiff was not disabled, because he retained the residual functional capacity ("RFC") to perform light, unskilled work.  (*Id* at 18–31.)  The ALJ denied Plaintiff's request for a consultative examination, because the evidence of record "clearly establishes the nature and extent of [Plaintiff's osteoarthritis]."  (*Id.* at 19.)

The ALJ first determined that Plaintiff had not engaged in SGA since his disability onset date.  (*Id.* at 20.)  Next, the ALJ found that Plaintiff had the following medically determinable and severe impairments: (1) Graves' disease, primarily ophthalmopathy; (2) diplopia; (3) a seizure disorder; (4) migraine headaches; and (5) osteoarthritis involving the right hip and shoulder.  (*Id.*)  None of these impairments, according to the ALJ, met or equaled the criteria of any of the established listings in Appendix 1, Subpart P, Regulations No. 4, section 1.00.  (*Id.* at 21.)  Moreover, the ALJ found that Plaintiff's memory deficits, abdominal pain, and gastritis were not severe impairments, reasoning that the record is devoid of complaints, diagnosis, treatment, or

recommendation for treatment of memory deficits with the exception of a notation of mild

memory problems by Dr. Wyatt.  (*Id.* at 20–21, 420.)  Further, the ALJ concluded that based on

the record, Plaintiff's abdominal symptoms occur only on "an intermittent basis and [] resolve

quickly with treatment."  (*Id.* at 21.)

Based on the evidence presented, the ALJ determined that Plaintiff retained the RFC to:

(1) lift up to twenty pounds occasionally; (2) lift up to ten pounds frequently; (3) sit, stand or

walk for up to six hours in an eight-hour workday with regular breaks; (4) stoop, kneel, crouch,

crawl, reach over shoulder level, and climb stairs occasionally; (5) handle, finger, feel, and climb

ramps frequently; and (6) read items the size of newsprint occasionally.  (*Id.* at 30–31.)

According to the ALJ Plaintiff could not: (1) climb ladders, ropes or scaffolding; (2) work at

unprotected heights; (3) work where driving is a major component of the job duties; (4) walk on

rocky terrain; (5) work in an environment which exposes him to extreme cold temperatures,

fumes or odors; and (6) work where acute vision is required beyond fifteen feet.  (*Id.*)

Additionally, the ALJ determined that Plaintiff should work in as smoke-free of an environment as

possible, with at most moderate light and noise levels, and "is limited to unskilled work requiring

remembering and carrying out simple job[] instructions and in which the job duties can be learned

within [thirty] to [sixty] days."  (*Id.* at 30–31.)

In accord with this RFC, the ALJ found that Plaintiff was limited to "light, unskilled work

requiring no driving or operating of machinery," and that Plaintiff could, therefore, no longer

perform his past relevant work.  (*Id.* at 29.)  The ALJ concluded that the light jobs recommended

by the VE were within Plaintiff's capabilities, and that such work exists in significant numbers in

the regional and national economy.  (*Id.* at 31.)  Based on the foregoing, the ALJ concluded

Plaintiff was not disabled.  (*Id.*)

Plaintiff appealed this decision.  (*Id.* at 5–8.)  On May 6, 2005 the Appeals Council

determined that the ALJ's decision was "supported by the totality of the evidence."  (*Id.*)  Thus,

the ALJ's decision became the Commissioner's final decision for the purposes of the present

appeal.  Plaintiff filed a complaint in this court on June 20, 2005, challenging the Commissioner's

denial of disability insurance benefits.  (Compl. [filed June 20, 2005].)

## ANALYSIS

### 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part:

> The findings of the Commissioner of Social Security as to any fact, if supported by
> substantial evidence, shall be conclusive, and where a claim has been denied by the
> Commissioner of Social Security or a decision is rendered under subsection (b) of
> this section which is adverse to an individual who was a party to the hearing before
> the Commissioner of Social Security, because of failure of the claimant or such
> individual to submit proof in conformity with any regulation prescribed under
> subsection (a) of this section, the court shall review only the question of
> conformity with such regulations and the validity of such regulations.

*Id.* § 405(g).  Thus, this court's review is limited to determining whether the record as a whole

contains substantial evidence supporting the Commissioner's decision.  *See id.*; *Hamilton v. Sec'y*

*of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The court must uphold

the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot re-weigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.      *Evaluation of Disability*

To qualify for disability insurance benefits under the Social Security Act, a claimant must meet the insured status requirements, be less than sixty-five years of age, and be under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving his disability, a claimant must make a *prima facie* showing that he is unable to return to prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must

demonstrate that the claimant can do other work activities and that the national economy provides

a significant number of jobs which the claimant could perform.  *Frey*, 816 F.2d at 512.      The

Commissioner has established a five-step process to determine whether a claimant qualifies for

disability insurance benefits.  *See* 20 C.F.R. § 404.1520 (2006); *Bowen v. Yuckert*, 482 U.S. 137,

140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled or not

disabled at any step, and, upon such a determination, the subsequent steps may be disregarded.

*See* 20 C.F.R. § 404.1520(a) (2006); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

First, the claimant must demonstrate that he is not currently involved in any substantial gainful

activity.  20 C.F.R. § 404.1520(b) (2006).  Second, the claimant must show a medically severe

impairment (or combination of impairments) which limits his physical or mental ability to do basic

work activities.  *Id.* § 404.1520(c).  At the third step, if the impairment matches or is equivalent

to established listings, then the claimant is judged conclusively disabled.  *Id.* § 404.1520(d).  If the

claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step.

At this stage, the claimant must show that the impairment prevents him from performing work he

has performed in the past.  *See Williams*, 844 F.2d at 751.  If the claimant is able to perform his

previous work, he is not disabled.  20 C.F.R. § 404.1520(e) (2006); *Williams*, 844 F.2d at 751.

This step requires a three phase analysis.

> In the first phase, the ALJ must evaluate a claimant's physical and mental [RFC],
> and in the second phase, he must determine the physical and mental demands of the
> claimant's past relevant work.  In the final phase, the ALJ determines whether the
> claimant has the ability to meet the job demands found in phase two despite the
> mental and/or physical limitations found in phase one.  At each of these phases, the
> ALJ must make specific findings.

*Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (citations omitted).  The fifth step

requires the Commissioner to demonstrate that the claimant has the RFC to perform other work

based on the claimant's age, education, past work experience, and evidence that such works exists

in significant numbers in the national economy.  *See* 20 C.F.R. § 404.1520(f ) (2006); *Williams*,

844 F.2d at 751.

**3.      *Disability Determination***

Plaintiff alleges the ALJ committed six reversible errors.  (Pl.'s Opening Br. at 10-19 [filed

Jan. 24, 2006] [hereinafter "Pl.'s Br."].)  Specifically, Plaintiff contends the ALJ erred: (1) in

finding Plaintiff less than credible; (2) in disregarding the opinion of Plaintiff's treating physician,

Dr. Wyatt; (3) in applying the incorrect legal standard in making the disability determination; (4)

at step three, in determining that Plaintiff's impairments were not sufficiently severe to meet or

equal any listing; and at step five (5) in failing to consider the functional effect of several of

Plaintiff's impairments and (6) in improperly relying on the VE's response to an imprecise

hypothetical.  (*Id.*)  Additionally, Plaintiff urges that, at minimum, the additional evidence

submitted contemporaneously with Plaintiff's Opening Brief merits remand.  (*Id.* at 18–19.)  I

address each argument below.[8]  (*Id.*)

**a.      *Plaintiff's Credibility***

The ALJ found Plaintiff less than fully credible, explaining, "Inconsistencies in the record

as to the severity and frequency of [Plaintiff's] seizure activity, fatigue, headaches and other pain

---

[8]In the interest of clarity, I analyze Plaintiff's arguments out of the sequential order in
which they appear in his brief.

complaints [ ] contribute to a conclusion that the claimant is not fully reliable." (*Id.* at 27.) Further, the ALJ concluded, evidence supporting Plaintiff's allegations is "lacking in the evidentiary record." (*Id.*)  Plaintiff argues the ALJ erred in assessing credibility by failing to: (1) apply the correct burden of proof; (2) support his determination with substantial evidence; and (3) consider Plaintiff's "excellent" work record.  (Pl.'s Br. at 12–16.)

"'Credibility determinations are peculiarly the province of the [ALJ].'"  *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 [10th Cir. 1995]).  Indeed, credibility determinations made by an ALJ are generally considered binding upon review.  *Gossett v. Bowen*, 962 F.2d 802, 807 (10th Cir. 1988).  Such determinations "should not be upset if supported by substantial evidence."  *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).  In assessing credibility, the ALJ may consider several factors, including subjective measures of credibility, as well as the consistency of the nonmedical evidence with the medical record.  *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (holding an ALJ may question credibility based on inconsistencies between the plaintiff's testimony and other record evidence).

In attacking the ALJ's credibility determination, Plaintiff first contends that the ALJ's statement, "'[Plaintiff's] allegations are not fully supported or consistent with the weight of evidence,'" shows that the ALJ failed to apply the preponderance of the evidence standard applicable in disability determinations.[9]  (Pl.'s Br. at 12 [quoting Admin. R. at 30].)  This

_____

[9]As pointed out by the Tenth Circuit, "Though the Social Security Act does not specify the appropriate standard [to apply in disability insurance proceedings], we agree . . . that there is

-23-

argument is just one of many permutations of Plaintiff's recurrent plea that this court reweigh the evidence before the ALJ.  (*See* Pl.'s Br. at 14, 15, 16, 17, 18.)  The only question before this court, however, is whether the ALJ's decision was supported by substantial evidence.  *Jordan,* 835 F.2d at 1316.  As explained in the paragraphs that directly follow, the ALJ's determination that Plaintiff was less than credible is supported by substantial evidence of record.  Moreover, it is well established that in making a credibility determination, an ALJ may compare the subjective complaints of the claimant with the medical record.  *See, e.g.*, *Eggleston*, 851 F.2d at 1247.  In the instant case, the ALJ's statement that "[Plaintiff's] allegations are not fully supported or consistent with the weight of evidence" simply demonstrates that the ALJ properly engaged in just such a comparison.  (Admin. R. at 27–28.)

Second, Plaintiff asserts that the ALJ's credibility determination was not supported by substantial evidence.  (Pl.'s Br. at 14–16.)  Specifically, Plaintiff argues the ALJ was unjustified in diminishing Plaintiff's testimony and subjective complaints regarding frequent and debilitating seizures, fatigue, and headaches.  (*Id.*)  An ALJ is required to link his pain and credibility findings to relevant evidence in the record.  *Kepler*, 68 F.3d at 391.  In the instant case, I find that  the ALJ supported his credibility findings with substantial record evidence.

Regarding Plaintiff's seizure disorder, Plaintiff complained in his medical journal of seizure activity beginning in April of 2002.  He documented seizures approximately every other day from

---

'no doubt that the preponderance of the evidence is the proper standard, as it is the default standard in civil and administrative proceedings.'"  *Young v. Apfel*, No. 98-6411, 1999 U.S. App. LEXIS 27918, at *5 (10th Cir. Oct. 28, 1999) (quoting *Jones x rel. Jones v. Chater*, 101 F.3d 509, 512 [7th Cir. 1996]).

September 14, 2002 to March 28, 2004 and testified to substantially the same effect at his April 2004 the hearing.  (*Id.* at 307, 306, 159–75, 452, 455).  In finding Plaintiff's alleged frequency of seizures less than fully credible, the ALJ emphasized several medical notes in the record that suggest Plaintiff's seizure disorder was less severe than alleged.  (*Id.* at 27.)  On May 14, 2002, Dr. Herrera wrote that Plaintiff had only three to four nocturnal seizures over the past seven months.  (*Id.* at 243.)  Two weeks later, Dr. Herrera noted that Plaintiff "seems to be seizure free for the time being on Carbatrol."  (*Id.* at 242.)  In June 2002, Dr. Clothier reported that Plaintiff's seizure disorder was "medicated" and "stable," although Plaintiff had complained of two "spells" in the "past several weeks."  (*Id.* at 251, 297.)  The ALJ emphasized Dr. Adam's written comment in April 2003 that, "by his history," Plaintiff "has not had any seizures in several months."  (*Id.* at 366.)  These notations by objective sources of decreased or ceased seizure activity in 2002 and 2003 are in direct conflict with Plaintiff's journal entries.  (*See id.* at 159–75.)

"More significantly," stated the ALJ, besides Dr. Wyatt,[10] "none of the claimant's treating sources imposed no [sic] work-related restrictions on the claimant, with regard to his seizure activity, with the exception of not driving[,] operating commercial vehicles, or working at heights or around moving machinery."  (*Id.* at 28.)  In fact, in May of 2003, Dr. Clothier noted that once Plaintiff's condition was stabilized, he "could probably perform most physical activity," except commercial driving.  (*Id.* at 255.)  Dr. Herrera similarly expected that, as a result of Plaintiff's seizure disorder, he would "seek a new job" that did not involve commercial driving.  (*Id.* at 242.)

---

[10]As discussed below, the ALJ properly rejected Dr. Wyatt's opinion.  (*See Analysis* § 3b, *infra.*)

This recommendation suggests Dr. Herrera did not view Plaintiff's seizure disorder as rending him incapable of engaging in SGA. Based on the aforementioned inconsistencies between Plaintiff's complaints and the medical record, as well as the failure of all but one of Plaintiff's treating physicians to determine the seizure condition prevents Plaintiff from working, I find there is substantial evidence of record to support the ALJ's determination that Plaintiff exaggerated his seizure condition.

Similarly, Plaintiff complained of severe, chronic, near-daily headaches in his September 14, 2002 through March 28, 2004 medical journal, as well as at the April 2004 hearing. (*Id.* at 159–75; 456–57.) In his decision, the ALJ recognized that Plaintiff's headache "problem is documented in the record, but not to the degree of the severity and frequency alleged." (*Id.* at 28.) In support, the ALJ pointed to the only "intermittent" complaints of headaches throughout Plaintiff's extensive medical records, as well as Plaintiff's indication at the hearing that his headaches improve with medication. (*Id.*) During the relevant time period, Plaintiff's medical records reveal complaints of headaches only in May and April of 2002 and in April of 2003. (*Id.* at 258, 366.) Moreover, on April 21, 2002, Dr. Adams wrote that Plaintiff's "chronic daily headaches" were "beginning to get under control." (*Id.* at 367.) Even Dr. Wyatt, the treating physician who placed the most restrictions on Plaintiff's capabilities, and who extensively listed the medical problems that allegedly preclude Plaintiff from engaging in SGA, did not make mention of Plaintiff's headaches in her FCA. (*See id.* at 416–20.) Based on the foregoing inconsistencies between Plaintiff's testimony and the record evidence, I find the ALJ did not err in

determining that Plaintiff's headaches did not occur with the frequency and severity claimed by Plaintiff.

Finally, Plaintiff urges the court to find the ALJ's determination that Plaintiff's fatigue was less severe than he claimed is not supported by substantial evidence. I cannot so find. The ALJ pointed to two pieces of evidence that support his conclusion. First, as the ALJ explained, the medical record reveals few complaints of extraordinary daytime sleepiness. (*Id.* at 28.) In fact, a notation regarding "excessive daytime somnolence" appears only once in the entire record. (*Id.* at 366.) Other references to fatigue suggest a less than severe problem. (*Id.* at 262 ["[t]ired today"], 258 ["[a] little fatigued"], 251 [sleep "not always restful due to right hip and shoulder pain"], 384 ["tired"].) Dr. Clothier noted in February of 2002 that Plaintiff "often sleeps restfully," and in May of 2002 that Plaintiff experiences "fatigue which respond[s] to a nap," but "[o]therwise, sleeps restfully." (*Id.* at 263, 253.)

Second, the ALJ relied on Plaintiff's statements in his disability application to conclude that Plaintiff led a "fairly active lifestyle." (*Id.* at 28.) This lifestyle, reasoned the ALJ, contradicted Plaintiff's complaints of extreme daytime sleepiness. (*Id.*) Plaintiff's daily activities are one of the many factors an ALJ may consider when making a determination regarding the credibility of Plaintiff's subjective complaints of pain. *Swanson v. Barnhart*, No. 06-5024, 2006 U.S. App. LEXIS 19965, at *5 (10th Cir. Aug. 2, 2006) (citing *Huston*, 838 F.2d at 1132); *see Fessler v. Apfel*, 11 F. Supp. 2d 1244, 1251 (D. Colo. 1998) (finding an ALJ may properly assess credibility based on "inconsistencies between [the plaintiff's] testimony, the medical evidence and [his] daily activities"). Plaintiff indirectly argues the ALJ erred in finding Plaintiff's lifestyle to be

"fairly active." (Pl.'s Br. at 14.)  Plaintiff asserted in his disability application that he was capable

of caring for his basic daily needs, including simple cooking, laundry, dishwashing and shopping.

He also claimed the capacity to venture out of the house by himself several times a week to visit

his brother at work or to run errands.  (Admin. R. at 112,113.)  These activities were properly

considered, along with other evidence on the record, in determining whether Plaintiff's complaints

of daytime fatigue were entirely credible.  *Cf. Broadbent v. Harris,* 698 F.2d 407, 413 (10th Cir.

1983) (holding daily activities of Plaintiff "may be considered along with medical testimony, in the

determination of whether a party is entitled to disability benefits").

Based on the foregoing, I find the ALJ's determination that Plaintiff's complaints of

seizure disorder, headaches and fatigue were less than fully credible is supported by substantial

record evidence.[11]

Lastly, Plaintiff argues the ALJ erred in failing to consider Plaintiff's "excellent earnings

record and his efforts to work despite his impairments."  (Pl.'s Br. at 15.)  The Tenth Circuit has

noted that "a [plaintiff's] prior work history is one of many factors an ALJ must consider in

assessing the credibility of a [plaintiff's] subjective complaints of disabling pain."  *Campbell v.*

*Barnhart*, 56 Fed. Appx. 438, 441 (10th Cir. 2003); *see* 20 C.F.R. § 404.1529(c)(3) (2006).

---

[11]Plaintiff also asserts"the ALJ wrongfully impugned [Plaintiff's] credibility when there
was evidence that the claimant's financial or mental condition did not allow for medicinal
compliance."  (Pl.'s Br. at 16.)  There is scant evidence on the record that Plaintiff was not
medicinally compliant with any degree of frequency.  In fact, in support of its argument, the
Plaintiff cites a state physician's FCA which notes that Plaintiff had "brief periods of non-
compliance with meds [sic]."  (Admin. R. at 181.)  Similarly, in February 2003, Dr. Clothier noted
that Plaintiff takes his medications "faithfully."  (*Id.* at 297.)  Plaintiff's argument is therefore
unavailing.

Arguably, "where the Plaintiff has a good work history, [he] is entitled to substantial credibility when [he] then asserts that [he] is unable to work." *Tyson v. Apfel*, 107 F.Supp. 2d 1267, 1270 (D. Colo. 2000).  The record reveals that Plaintiff worked consistently from 1996 to 2002 in a paid, full-time job. (Admin. R. at 99–106.)  Nothing in the record, however, suggests that the ALJ failed to consider this work history.  During the April hearing, the ALJ questioned Plaintiff extensively about his past work experience. (*Id.* at 443–51.)  The ALJ also stated that in making his determination, he "considered . . . the claimant's prior work record" and specifically noted all of Plaintiff's relevant past work experience. (*Id.* at 23, 29.)  More importantly, Plaintiff's work record is wholly distinct from the inherent inconsistencies between Plaintiff's subjective complaints and the medical record.  It is these inconsistencies upon which the ALJ relied in making his credibility determination.  As I have already determined, these inconsistencies are sufficient to support the ALJ's credibility determination.

### b.    The ALJ's Rejection of Dr. Wyatt's Opinion

The ALJ rejected the opinion of one of Plaintiff's treating physicians, Dr. Wyatt, as set forth in an FCA dated May 7, 2004 and a questionnaire regarding Plaintiff's seizure condition.[12] (Admin. R. at 416–20, 427–31).  Plaintiff argues the ALJ erred in failing to give controlling weight to Dr. Wyatt's opinion. (Pl.'s Br. at 16–17.)  An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(d)(2) (2006); *Hamlin v. Barnhart*,

---

[12]For a more extensive review of Dr. Wyatt's opinion, *see Medical Evidence* §1k, *supra.*

365 F.3d 1208, 1215 (10th Cir. 2004). If the ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must consider a series of factors in determining the amount of weight to give the opinion, including the degree to which the opinion is supported by relevant evidence and the opinion's consistency with the record as a whole. *See* 20 C.F.R.§ 404.1527(d)(2)-(6) (2006); *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995). Should an ALJ disregard the opinion of a treating physician, the ALJ must set forth "specific, legitimate reasons" for doing so. *Hamlin*, 365 F.3d at 1215. I find the ALJ has satisfied this burden in the instant case.

The ALJ rejected Dr. Wyatt's opinion due to inconsistency with the medical record and the opinions of all other treating physicians. (Admin. R. at 26–27.) The ALJ pointed out that Dr. Wyatt's own medical records "generally show[] that [Plaintiff's] overall medical condition was stable, when he was able to take his medication." (*Id.* at 26.) Thus, the ALJ posits that Dr. Wyatt's conclusions regarding Plaintiff's work capabilities are not corroborated by her clinical notes. For instance, during those eight months that Dr. Wyatt's notes span, she documents complaints of only two seizures. (*Id.* at 390, 389.) Nevertheless, Dr. Wyatt opined that Plaintiff's seizure disorder prevented him from engaging in SGA. (*Id.* at 428.) The ALJ also pointed out that "Dr. Wyatt's records do not contain any significant complaints by the [Plaintiff] of severe arthritic pain or limitations resulting from this condition." (*Id.* at 26.) Still, Dr. Wyatt concluded that Plaintiff's arthritis was so debilitating as to prohibit him from ever lifting more than ten pounds or from engaging in "any prolonged activity." (*Id.* at 416, 417.)

Similarly, the ALJ found Dr. Wyatt's conclusion that Plaintiff's multiple impairments render him incapable of engaging in SGA to be "inconsistent with the other substantial evidence of record." (*Id.* at 26.) As the ALJ explained, "[Plaintiff's] other treating sources reported he could perform most physical work not requiring working at heights, operating machinery or driving commercial vehicles." (*Id.* at 26–27.) Dr. Clothier, who acted as Plaintiff's primary care physician for almost three years, opined that "once stabilized," Plaintiff "could probably perform most physical activity," except commercial driving. (*Id.* at 255.) Similarly, Dr. Adams limited Plaintiff's work activities only to the extent of driving, working at heights, working with heavy equipment, and working in a circumstance in which "sudden loss of consciousness will get [Plaintiff] in trouble." (*Id.* at 369.) I find the ALJ's rejection of Dr. Wyatt's opinion that Plaintiff could not engage in SGA was supported by "specific, legitimate reasons for doing so." *Watkins v. Barnhart*, 350 F.3d at 1297, 1301 (10th Cir. 2003) (internal quotations omitted). Further, the ALJ's determination that Dr. Wyatt's opinion was inconsistent with the evidence of record is supported by substantial evidence.

c.      ***The Legal Standards Applied by the ALJ***

Plaintiff argues the ALJ applied an incorrect legal standard in: (1) determining Plaintiff was capable of engaging in SGA ("SGA"); and (2) limiting Plaintiff's counsel's cross-examination of the VE. (Pl.'s Br. at 10–13.) I address each argument below.

The ALJ stated in his decision, "[T]he record does not support the claimant's contention that his osteoarthritis is of sufficient severity as to preclude *all work activity* and severely limit his standing and walking abilities." (Admin. R. at 28 [emphasis added].) Plaintiff contends the

application of "the all work activity standard is reversible error," because the ALJ should have instead considered whether the Plaintiff's impairments precluded him from engaging in SGA. (Pl.'s Br. at 10.)

"[SGA] means performance of substantial services with reasonable regularity, either in competitive or self employment." *Markham v. Califano*, 601 F.2d 533, 534 (10th Cir. 1979). When, as in this case, "an individual is not engaging in [SGA] and a determination or decision cannot be made on the basis of medical factors alone," (*i.e.*, when the impairment is severe but does not meet or equal a listing), the ALJ generally must make an RFC assessment to determine whether the individual has the capacity to engage in SGA. *See* SSR No. 96-8p (1996). In making this determination, the ALJ must consider the Plaintiff's ability to work "[eight] hours a day, for [five] days a week, or an equivalent work schedule." *Id.*

The court assumes without deciding that an RFC assessment that asks whether an individual's impairments would preclude him from "all work activity" would be in error, as it would fail to properly assess an individual's capacity to do regular and sustained work. *See Ricketts v. Apfel*, 16 F.Supp. 2d 1280, 1295–96 (D. Colo. 1998) (finding the ALJ's application of an "all work activity" standard was in error). Nevertheless, I find that such error would be harmless, as the ALJ in the instant case identified substantial evidence on the record to support his finding that Plaintiff's osteoarthritis does not preclude Plaintiff from working on a regular and continuing basis. *See Glass v. Shalala*, 43 F.3d 1397 (10th Cir. 1994) (holding harmless error where evidence issue would not have unfairly affected the ultimate result). The ALJ explained, "[T]here are few complaints of arthritic pain in the record and in October 2003, Dr. Gold reported

that the claimant's osteoarthritis symptoms had improved with [medication]." (Admin. R. at 28.)
Dr. Wyatt was the only treating physician who concluded that Plaintiff's osteoarthritis was
disabling. As noted above, however, her medical records were "devoid of any significant
complaints by the [Plaintiff] of arthritic pain and resulting limitations," and her opinion was
properly rejected by the ALJ. (*See Analysis* § 3b, *supra.*)

Moreover, the ALJ's opinion clearly reveals that his RFC determination was based on an
evaluation of the Plaintiff's ability to work on a regular and continuing basis. At the April 2004
hearing, the ALJ explicitly stated that his goal in questioning Plaintiff was to determine "what
problems most get in the way of [Plaintiff's] ability to work on a regular, sustained basis,
[meaning] five days a week, eight hours a day." (Admin. R. at 451.) The ALJ expressly relied on
this testimony in making his RFC assessment, as well as the testimony of the VE, which was
based on hypotheticals that assumed "an eight-hour work shift." (*Id.* at 27–29, 484.)
Accordingly, I find the ALJ applied the correct legal standard when determining whether Plaintiff
was capable of engaging in SGA.

Finally, Plaintiff's argument that the ALJ restricted Plaintiff's opportunity to fully and
fairly cross-examine the VE in violation of due process is without merit. (Pl.'s Br. at 12.) A
close examination of the transcript shows that the ALJ did not prevent Plaintiff's counsel from
cross-examining the VE. (Admin. R. at 488–92.) On the contrary, the ALJ sought to increase
the efficiency of the hearing and the relevance of the VE's testimony by directing Plaintiff's
counsel to refrain from asking open-ended questions. (*Id.*) The ALJ directed Plaintiff's counsel
to "identify to the [VE] something specific that [counsel wants] to ask [the VE], whether it be

related to seizures, or headaches, or naps." (*Id.* at 489.)  The ALJ not only has the right, but the

responsibility to "conduct the proceedings in an orderly and efficient manner."  C.F.R. §

405.320(a) (2006).  The ALJ did not err in doing so here.

> ### d.      The ALJ's Step Three Determination

At step three, the ALJ determined that Plaintiff's impairments were not sufficiently severe

to meet or equal the requirements of any listing.  (Admin. R. at 21.)  Plaintiff argues the ALJ

erred at this step in failing to: (1) address Plaintiff's daily symptom logs with regards to Plaintiff's

seizure disorder; (2) explain why [Plaintiff's] impairments in combination do not equal a listing;

and (3) develop the record as to the limiting effects of Plaintiff's osteoarthritis, mental state, and

head trauma.[13]  (Pl.'s Br. at 13–14.)

Plaintiff's argument that the ALJ erred in his RFC evaluation by failing to consider the

seizures as documented in Plaintiff's medical journal is unavailing.  As discussed above, the ALJ,

in making his credibility determination, properly concluded that Plaintiff's journal overstated the

frequency and severity of his seizures.  (*See Analysis* § 3a, *supra*.)  Thus, the ALJ could properly

have concluded that Plaintiff's account of his seizure disorder, as reported in the journal, did not

affect the RFC evaluation.  It should be noted, however, that the ALJ's failure to explicitly discuss

---

[13]Additionally, Plaintiff indirectly argues that his headaches equal a listing.  (Pl.'s Br. at 13.)  In support, Plaintiff asserts, "The [VE] stated that the headache symptoms as described by the [Plaintiff] would be incompatible with holding a job."  (*Id.*)  Assuming, *arguendo*, that the VE did so testify, such testimony would be irrelevant, as the ALJ has properly cast doubt on the credibility of Plaintiff's subjective complaints regarding the frequency and severity of his headaches.  (*See Analysis* § 3a, *supra*.)  Secondarily, Plaintiff also failed to identify an applicable listing that such headaches might equal.

Plaintiff's medical journal in the context of the RFC evaluation does not mean that the ALJ neglected to consider the journal. As the Tenth Circuit made manifest, "an ALJ is not required to discuss every piece of evidence," so long as the record demonstrates the ALJ considered all of the evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I find the record clearly demonstrates that the ALJ considered Plaintiff's medical journal.

Plaintiff also argues the ALJ failed to consider the combined effects of Plaintiff's impairments. *See Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991) (holding that an ALJ "must consider the combined effects of impairments that may not be severe individually, but which in combination may constitute a severe medical disability"). Nothing in the record suggests all of Plaintiff's impairments were not properly considered. *See Eggleston*, 851 F.2d at 1247. In fact, the ALJ specifically stated that after consideration of Plaintiff's "multiple physical complaints," he found "the record does not support [Plaintiff's] contention that his impairments, either singly *or in combination,* render him disabled." (Admin. R. at 23 [emphasis added].) Moreover, the ALJ's proposed hypotheticals to the VE as well as his RFC evaluation reflect a consideration of the limiting effects of each of the Plaintiff's plethora of ailments. (*Id.* at 483–84, 30–31.) After reviewing the record as a whole, the court is convinced that the ALJ properly considered the cumulative effect of Plaintiff's impairments.

Lastly, Plaintiff argues the ALJ failed to develop the record regarding Plaintiff's osteoarthritis, mental state, and head trauma. (Pl.'s Br. at 13–14.) Although the plaintiff has the burden of proving disability under the Social Security Act, the ALJ "has a basic duty of inquiry, 'to inform himself about facts relevant to his decision and to learn a [plaintiff's] own version of

the facts.'" *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 [1983]).  Here, the ALJ considered Plaintiff's osteoarthritis under Listing 1.02.  (Admin. R. at 21.)  Plaintiff, however, claims the record was not sufficiently developed to allow the ALJ to make a determination regarding whether the osteoarthritis alone, or in combination with Plaintiff's other ailments, rendered him disabled.  (Pl.'s Br. at 13.)  Plaintiff's almost three-hundred page medical record contains only intermittent complaints of osteoarthritic pain, and nothing in the record suggests these complaints do not fully and fairly reflect the frequency and severity of Plaintiff's pain during the relevant time period.  (*Id.* at 251, 300, 110–11.)  Thus, I conclude th ALJ had no reason to develop the record regarding this listing.

Similarly, there is ample record evidence to support the ALJ's finding that Plaintiff's mental state did not render him disabled.  Three neurological exams by three different doctors revealed no neurological abnormalities.  (*Id.* at 220, 310, 366.)  The only finding the Plaintiff had mental deficiencies was by Dr. Wyatt, whose opinion I have already found the ALJ properly discounted.  (*See Analysis* § 3b, *supra.*)

Finally, nothing in the record suggests it was insufficiently developed regarding Plaintiff's head trauma.  The ALJ noted Dr. Herrera's conclusion that Plaintiff's seizure disorder was linked to a childhood head injury.  No objective sources indicated Plaintiff's head trauma was linked to any of his medical problems besides his seizure condition, except conceivably Dr. Wyatt's report, which the ALJ properly rejected.  (*See Analysis* § 3b, *supra.*)  The ALJ clearly considered Plaintiff's seizures at step three.  (*Id.* at 25, 30–31.)  Based on the foregoing, I find there was no

reason for the ALJ to further develop the record regarding Plaintiff's osteoarthritis, mental state, or head trauma.

### e.        The ALJ's RFC Evaluation

It is the duty of the ALJ to weigh the functional effect of all Plaintiff's impairments, singly and in combination.  20 C.F.R. § 404.1545(a), (e) (2006).  Plaintiff asserts that in making the RFC assessment, the ALJ failed to consider the functional effect of several of Plaintiff's impairments, including Plaintiff's: (1) abdominal problems; (2) atrial fibrillation and chest problems; (3) headaches; (4) somnambulance; and (5) vertigo.  (Pl.'s Br. at 14–16.)  Plaintiff also contends that the ALJ rejected treating physicians' prescription that Plaintiff not drive, and that such rejection was not supported by substantial evidence.  (Admin. R. at 14.)

Plaintiff's arguments boil down to yet another thinly veiled plea for the court to reconsider the evidence before the ALJ.  I remind Plaintiff that in reviewing the ALJ's RFC assessment, this court may not reweigh the evidence and substitute its judgment for that of the ALJ.  *Jordan*, 835 F.2d at 1316.  I emphasize that ALJs retain the exclusive final responsibility to decide a plaintiff's RFC.  *See* 20 C.F.R. §§ 404.1527, 404.1545(b), 404.1546(c) (2006).  As discussed below, I find the ALJ considered and addressed each of Plaintiff's relevant medical complaints, and supported his RFC evaluation with substantial evidence.  This is sufficient.  The ALJ did not err.

First, the ALJ specifically addressed Plaintiff's abdominal pain and gastritis, and found the impairment was not severe.  (*Id.* at 20–21.)  After reviewing each of Plaintiff's documented abdominal complaints, the ALJ concluded that "[Plaintiff's] abdominal symptoms occur on a very intermittent basis, and resolve quickly with treatment."  (*Id.* at 21, 202, 268, 220, 409.)  The ALJ

noted that "at the hearing[, Plaintiff] had no complaints related to recent bout of abdominal pain." (*Id.* at 21.)  Accordingly, the ALJ's failure to account for abdominal pains in his RFC evaluation is supported by substantial record evidence.

Second, although the ALJ noted Plaintiff's complaints of "chest pain, shortness of breath[,] and palpitations," the ALJ did not explicitly account for these symptoms in his RFC assessment.  (*Id.* at 24.)  His reasons for doing so are clear.  As the ALJ pointed out, both of the Plaintiff's echocardiograms were "essentially normal with the exception of only mild ventricular insufficiency."  (*Id.* at 24, 191, 291, 399.)  The ALJ also noted that none of Plaintiff's doctors concluded that his chest palpitations and shortness of breath were cardiac in nature, or inhibited Plaintiff's ability to work.  (*Id.* at 24–25.)  Further, despite Plaintiff's contentions of palpitations, chest pains, and shortness of breath beginning in 1986, the record reflects that Plaintiff was able to hold down steady, medium, full-time employment until 2002.  (*Id.* at 382, 83–90.)  Accordingly, I conclude that the ALJ did not err in choosing not to specifically address Plaintiff's chest and heart problems in the RFC evaluation.

Third, the ALJ recognized that Plaintiff's headaches and somnolence were documented in the record, but properly cast doubt on the credibility of Plaintiff in regards to the claimed severity and frequency of his symptoms.  (*Id.* at 28.; *see Analysis* § 3a, *supra.*)  "[G]iving credence to [Plaintiff's] complaints of daytime somnolence and headaches," the ALJ's RFC evaluation found that Plaintiff "is limited to unskilled work requiring remembering and carrying out simple job instructions and in which the job duties can be learned within [thirty] to [sixty] days."  (*Id.* at 31.)

Accordingly, I find the ALJ considered and addressed Plaintiff's headaches and sleepiness in his RFC evaluation, supporting his determination with substantial evidence.

Fourth, no objective source suggested that Plaintiff's vertigo was an impairment to his ability to engage in SGA.  In fact, the medical record reveals strikingly few complaints of vertigo. (*Id.* at 390.)  Although Plaintiff's medical journal documents dizzy spells fifteen or more times each month from late 2002 through March 2004, the ALJ properly cast doubt on the credibility of Plaintiff's medical journals.  (*Id.* at 159–74; *see Analysis* § 3a, *supra*.)  Thus, the ALJ did not err in determining that Plaintiff's vertigo did not affect the RFC evaluation.

Finally, Plaintiff argues the ALJ improperly rejected driving restrictions imposed on Plaintiff by treating physicians.  (Pl.'s Br. at 14.)  It is true that both Dr. Clothier and Dr. Adams prohibited Plaintiff from commercial driving, at least until he was six months seizure free. (Admin. R. at 255, 369.)  Still, Plaintiff's argument is confounding, as the ALJ explicitly stated in his opinion that Plaintiff was limited to "light, unskilled work, requiring *no driving* or operating of machinery."  (Admin. R. at 29 [emphasis added].)  Moreover, none of the three jobs identified by the ALJ as being within Plaintiff's RFC require any driving as a component of the job duties.  *See* NAT'L ACAD. OFSSCIENCES, DICTIONARY OF OCCUPATIONAL TITLES (1980) (sales attendant, Department of Transportation ("DOT") 299.677-010; cleaner/housekeeper, DOT 323.687-014; counter clerk, DOT 249.366-010).

### f.     The ALJ's Reliance on the VE's Testimony

Plaintiff argues that the ALJ erred at step five in relying upon the VE's response to an imprecise hypothetical.  (Pl.'s Br. at 17–18.)  Specifically, Plaintiff urges the ALJ was required to

include Plaintiff's need to avoid stress, driving, and tobacco smoke in the hypothetical, as well as Plaintiff's osteoarthritis, abdominal pains, vertigo, fatigue, headaches, and loss of concentration and memory.[14] (*Id.*) "'Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.'" *Hargis*, 945 F.2d at 1492 (quoting *Ekeland v. Bowen*, 899 F.2d 719, 724 [8th Cir. 1990]). I find the hypotheticals proposed by the ALJ were proper. I address each of Plaintiff's specific contentions below.

First, the only record evidence identified by Plaintiff regarding his alleged problem with stress in the workplace is from the early 1980's, well before Plaintiff's claimed disability onset date. (Pl.'s Br. at 18; Admin. R. at 186.) The impairment is therefore irrelevant to Plaintiff's present disability claim. Second, the ALJ explicitly asked the VE to assume an individual that needed to avoid smoke as well as driving. (Admin. R. at 484.) Third, as discussed above**,** the ALJ properly determined that Plaintiff's abdominal problems and vertigo were of insufficient severity to impact the RFC assessment. (*See Analysis* § 3e, *supra*.) As such, there was no reason for these alleged impairments to be included in the ALJ's hypothetical. Fourth, regarding Plaintiff's osteoarthritis, the ALJ included the impairment in his hypothetical by directing the VE to assume an individual who "should avoid concentrated exposure to cold" and who has significant sitting, standing, walking, lifting, carrying, and reaching restrictions. (*Id.* at 483–84.)

---

[14]In essence, Plaintiff rehashes his argument that the ALJ erred in evaluating the evidence of Plaintiff's disability. Again, I emphasize that this court may not reweigh the evidence and substitute its judgment for that of the ALJ. *Jordan*, 835 F.2d at 1316.

Finally, the ALJ asked the VE to assume that secondary to fatigue, headache pain, concentration, and memory complaints, "this person would be limited to understanding, and remembering, and carrying out only simple work instructions and processes, those kinds of things learned within a period of approximately [thirty] to [sixty] days." (*Id.* at 485.)  Although this hypothetical may not assume the degree of pain and impairment asserted by the Plaintiff, as discussed above, the ALJ properly cast doubt on the credibility of Plaintiff's subjective complaints as to the degree and frequency of his impairments.[15]  (*See Analysis* § 3b, *supra*.)  I, therefore, conclude that the ALJ's hypotheticals as posed to the VE properly included all of Plaintiff's relevant impairments.

> **g.**     ***Remand/Consideration of Additional Evidence***

Plaintiff urges that if the court refuses to reverse, it should remand for consideration of additional evidence submitted contemporaneously with Plaintiff's Opening Brief.  (Pl.'s Br. at 18–19.)  The court may order remand "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(d) (2006).  A remand is proper on account of new evidence only when the reviewing court concludes "the new evidence would have changed the [ALJ's] decision had it been before him."  *Hargis*, 945 F.2d at 1493.  Social security regulations, however, make clear that additional evidence is to be considered "only where it relates to the

---

[15]Plaintiff's argument that the ALJ erred in failing to include all of the impairments set forth by the state agency physician is meritless.  (Pl.'s Br. at 18.)  As pointed out by the Government, "In fact, the ALJ's RFC determination is much more restrictive than the August 2002 [FCA] completed by the [state] physician."  (Defendant's Response Brief  at 16; Admin. R. at 176-183.)  I agree.

period on or before the date of the [ALJ] hearing decision."  20 C.F.R. § 404.970(b) (2006); *see Hargis*, 945 F.2d at 1493 (finding remand based on new evidence is only appropriate when "the proffered evidence relate[s] to the time period for which the benefits were denied").

The new evidence offered by Plaintiff is a December 29, 2005 favorable disability determination by the state of Colorado, with an attachment of a December 28, 2005 evaluation by Dr. Maria C. Israel concluding that Plaintiff equals Listings 1202A, 1204A and 1206A in combination.  (Pl.'s Br., Ex. 1 at 1–18 [Colorado Disability Determination and attachments].)  As noted above, Dr. Israel made her findings in December of 2005, more than a year after the ALJ's May 2004 decision, and her evaluation does not conclude that her findings reflect Plaintiff's condition at the time of the ALJ's decision.  (*Id.* at 5–17.)  On the contrary, based in part on Dr. Israel's findings, the state disability examiner determined that Plaintiff's disability onset date was June 9, 2005.  (*Id.* at 4.)  Thus, remand is inappropriate, as the Plaintiff has failed to show that the new evidence "relate[s] to the time period for which the benefits were denied."  *Hargis*, 945 F.2d at 1493.

**4.    Conclusion**

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 14th day of September, 2006.

BY THE COURT:


<u>s/ Edward W. Nottingham</u>
EDWARD W. NOTTINGHAM
United States District Judge